

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANGELA DENISE CURTIS,                    )
as Administratrix of the Estate of       )
Robert Anthony Curtis II, Deceased,      )
                                         )
            Plaintiff,                   )
vs.                                      )    Case No. 2:07-cv-1871-TMP
                                         )
CITY OF TUSCALOOSA, *et al.*,            )
                                         )
            Defendants.                  )

## **MEMORANDUM OPINION**

This cause is before the court on two motions for summary judgment.  The first was filed on

May 21, 2009, by defendants Randy Michael Baygents and Jimmy S. Sanford.  The second was filed

May 28, 2009, by defendants City of Tuscaloosa and Ken Swindle. Defendants seek dismissal of all

of plaintiff's remaining claims[1] based on immunities and other grounds.  A supplement to the motion

was filed July 17, 2007.  Plaintiff has filed a brief in opposition, along with exhibits.  The court has

considered the evidence and the arguments set forth by both parties.   The parties have consented

to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c).

---

[1]        Most of plaintiff's claims already were dismissed upon defendants' motions to
dismiss, based on the Memorandum Opinion and Order entered March 30, 2009 (Doc. 52).  In
addition, all claims against Swindle were dismissed in that order.  Accordingly, to the extent that he
seeks summary adjudication, his motion is MOOT.  In the event, however, that there remains a claim
against defendant Swindle, he is entitled to summary judgment for the reason that his subordinate
officers, Baygents and Sanford, did not violate any of plaintiff's or plaintiff's decedent's rights.
Thus, if not moot, defendant Swindle's motion for summary judgment also is GRANTED.

## I.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

2

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts

are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  <u>Anderson</u>, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## **II.  FACTS**

Plaintiff Angela Denise Curtis (hereinafter "the plaintiff") brought this action pursuant to 42 U.S.C. § 1983 and Alabama state law, contending that defendants Baygents and Sanford unlawfully used excessive force in the course of the attempted arrest of her son, Robert Anthony Curtis II (hereinafter "the decedent").[2]  Plaintiff further contends that the defendant City is liable under state law for negligently failing to train, supervise, or investigate Baygents and Sanford.  For purposes of determining the merits of defendants' motion for summary judgment, the court views the facts in the light most favorable to the nonmovant and considers the following facts to be undisputed:

On October 15, 2005, Defendant Baygents was working as a police officer for the City of Tuscaloosa.  At 6:06 a.m., shortly before daybreak, Baygents saw a white SUV run a red light and make a U-turn.  The police car was equipped with audio and video equipment, which recorded the white SUV traveling in front of the police car.  Baygents began to follow the SUV, and attempted to stop the vehicle by using lights and siren.  The SUV did not slow down or pull over.  Instead, the SUV made several turns, ran another red light, and increased in speed.  Just three minutes after the

---

[2]     The complaint alleges claims on behalf of Angela Curtis individually and as administratrix of the estate of her son.

chase began, the SUV made a wild turn off the main road, crashing into a brick apartment sign that marked the entrance to an apartment complex parking lot.  The vehicle continued forward into the parking lot and pulled into a parking space.  Baygents, who had by then requested backup, got out of his patrol car and approached the car with his handgun drawn.  The SUV remained running with the lights on for a few seconds, and then quickly began to back out of the parking space.  Baygents' car was parked in the lot between the SUV and the entrance to the lot.  By the time the SUV backed out of the space, a second officer, defendant Sanford, also had arrived on the scene.  His patrol car also was parked between the SUV and the apartment entrance, partially blocking the SUV's exit.[3] As Baygents approached the SUV, the driver accelerated forward, toward the street and in the direction of the police cars.   Baygents yelled to the driver, "Don't do it, don't do it .... Stop or you are going to get shot! Stop!" The SUV continued to accelerate rapidly.[4]  Shots were fired into the SUV, and the SUV continued forward, tires spinning and rubber burning.  Sanford was pinned between the SUV and a car parked in the lot, and suffered serious leg injuries.  Baygents pulled the driver of the SUV out of the car, and moved the SUV back in order to free Sanford.  The driver, Robert Anthony Curtis II, died at the scene of multiple gunshot wounds.  Sanford was taken to the hospital for treatment.  Less than four minutes elapsed between the time the decedent ran the first red light, and the time the shots were fired.

---

[3]      It is not clear at what point Sanford's car arrived or when he got out of the car, but the entire encounter in the parking lot lasted only about a minute.

[4]      At this point, the SUV drove out of the range of the police car's dashboard camera. The audio recording, however, captured the sound of the gunfire, and the ensuing sound of the tires spinning, Sanford screaming in pain, and Baygents telling Sanford that he was going to help him.

Photographs taken after daybreak show multiple bullet holes in the hood and front windshield of the SUV, and that the front passenger window was broken out.  Several shots were fired from the general direction of the front of Curtis's vehicle.[5]  At least one bullet was fired from the passenger side of the car, where Sanford was standing.

## III.  DISCUSSION

Plaintiff's claims set forth as Counts 1, 2, 3, and 10 already have been dismissed.  Counts 4, 5, and 6, which allege state-law claims of negligent hiring, training, or supervision of defendants Baygents and Sanford against Swindle and/or the City, have been dismissed except to the extent the plaintiff asserts that some person other than Swindle was responsible for the hiring, training, or supervision.  (Memorandum Opinion and Order, Doc. 52).  Because plaintiff has not asserted that any other individual was responsible, these claims against the City of Tuscaloosa also are due to be dismissed on summary judgment in favor of the city.[6]  Counts 7 and 8 allege a federal constitutional

---

[5]     The facts are essentially the same as recited in this court's Memorandum Opinion regarding the motions to dismiss.  At that time, however, the court had not seen the video recording of the incident or the photos of the scene taken afterward.  This description of the incident is based almost entirely upon what can be seen and heard when watching the video and audio recording, or viewing the photographs.  Cf. Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (Plaintiff's testimony contradicted by a dashcam video is not sufficient to create a genuine issue of fact for summary judgment).  The court need not rely upon the affidavits of the officers to establish the facts.  The plaintiff has come forward with no evidence that disputes what can be clearly seen on the video or heard in the audio.  Moreover, the plaintiff concedes that the SUV was moving toward the parking lot entrance, which was in the direction of the officers, and that shots were fired from in front of the SUV.  Although plaintiff argues at great length that the decedent was trying to flee and not trying to threaten the officers, this argument fails to address the central issues discussed below in text.

[6]     An answer to an interrogatory does provide the name of a police captain who was responsible for training, but, even if plaintiff were attempting to hang liability on this alternative peg,

violation against Baygents and Sanford arising from the use of excessive force, and Count 9 asserts that the City had a policy or custom of tolerating excessive force.

Plaintiff has not come forward with any evidence that the hiring, training, or supervision of Baygents and Sanford was in any way deficient, and these claims are not addressed in any manner in the plaintiff's opposition to the motions for summary judgment.[7]  Accordingly, defendant City (the only remaining defendant as to these claims) is entitled to summary judgment in its favor on the state-law claims set forth in Counts 4, 5, and 6.   Plaintiff similarly has failed to show any "policy or custom" relating to excessive force, except to argue that the press release issued by the police department after the incident did not include certain "facts" that the plaintiff's counsel asserts were

---

it would fail because there is no evidence that the police officers engaged in any negligent or tortious conduct, or that the hiring, training, or supervision of the two officers involved in the incident was in any way deficient.

[7]      Because the court has determined that the conduct of the officers at issue was not excessive force, and was justifiable under the circumstances, the negligence claims lack any basis in law.  In any event, plaintiff makes no argument that the negligence claims are viable.  Plaintiff has provided the court with manuals regarding the use of force that were produced by defendants. Perhaps plaintiff's counsel expects the court to examine the manuals and make some judgment as to whether the procedures therein pass constitutional muster, but plaintiff points to no insufficiencies, inaccuracies, or errors, nor does plaintiff provide any testimony to relate the manuals to the incident in this case.  The court declines to construct a case for the plaintiff, or to speculate as to what case plaintiff intended to make.

relevant.[8]   For this reason, summary judgment is also due to be granted in favor of the City on Count 9.  The court will, therefore, address the sole remaining claims as set forth in Counts 7 and 8.

### A. § 1983 Claims

Plaintiff's claims set forth as Counts 7 and 8, excessive use of force, arise under 42 U.S.C. § 1983, which provides a right of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" when the deprivation is caused by anyone acting under color of law.  Id.  To be entitled to recover under § 1983, the plaintiff must show both that her and her decedent's constitutional rights were violated by persons acting under color of state law.  The fact police officers Baygents and Sanford were acting under color of state law is not disputed by the parties.  Nor is it disputed that they were acting within their lawful discretion in attempting to arrest the decedent.

The Fourth Amendment protects citizens from "unreasonable" seizures, which includes prohibiting the use of unreasonable force in effecting a lawful and legitimate seizure.  Graham v.

---

[8]     Plaintiff argues that the media release "conveniently omitted the fact that when they excited [sic] their vehicles the officers had their weapons drawn and threatened to shoot the [sic] Curtis if he attempted to leave the parking lot" and that "one of the officers placed himself directly in front of the suspect's vehicle exiting the parking lot, providing the other officer a convenient justification for shooting the suspect."  First, a media release made after the shooting, even if incomplete, slanted, or downright wrong, is not evidence that the officers at the scene employed excessive force, or that the City had a custom or practice of tolerating excessive force by officers. Second, the "facts" recited by plaintiff may explain plaintiff's counsel's theory of the case, but they simply are not supported by any evidence.  Finally, it seems outlandish to contemplate that the officers, after a short chase led by an unknown suspect, were so determined to kill the decedent that one of them risked his own life, and indeed suffered serious injury, in order to give the other one a "justification" for the shooting.

Connor, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989); Lee v. Ferraro, 284

F.3d 1188, 1197 (11th Cir. 2002) ("The Fourth Amendment's freedom from unreasonable searches

and seizures encompasses the plain right to be free from the use of excessive force in the course of

an arrest.").  The court of appeals has explained its Fourth Amendment excessive force principles

as follows:

> The Supreme Court has instructed that "all claims that law enforcement officers have
> used excessive force — deadly or not — in the course of an arrest, investigatory stop,
> or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment
> and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct.
> 1865, 104 L. Ed. 2d 443 (1989).  It is well established that "the right to make an
> arrest or investigatory stop necessarily carries with it the right to use some degree of
> physical coercion or threat thereof to effect it."  Id. at 396, 109 S. Ct. 1865.  To
> determine whether the force used is reasonable under the Fourth Amendment requires
> a careful balancing of the nature and quality of the intrusion on the individual's
> Fourth Amendment interest against the countervailing governmental interests at
> stake.  See id.; Tennessee v. Garner, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1
> (1985); Crosby v. Paulk, 187 F.3d 1339, 1351 (11th Cir. 1999).  Because "[t]he test
> of reasonableness under the Fourth Amendment is not capable of precise definition
> or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559, 99 S. Ct. 1861,
> 60 L. Ed. 2d 447 (1979), "its proper application requires careful attention to the facts
> and circumstances of each particular case, including the severity of the crime at issue,
> whether the suspect poses an immediate threat to the safety of the officers or others,
> and whether [the suspect] is actively resisting arrest or attempting to evade arrest by
> flight." Graham, 490 U.S. at 396, 109 S. Ct. 1865.

> Therefore, "[u]se of force must be judged on a case-by-case basis
> 'from the perspective of a reasonable officer on the scene, rather than
> with the 20/20 vision of hindsight.'" Post v. City of Fort Lauderdale,
> 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting Graham, 490 U.S. at 396,
> 109 S. Ct. 1865).  "The calculus of reasonableness must embody
> allowance for the fact that police officers are often forced to make
> split-second judgments — in circumstances that are tense, uncertain,
> and rapidly evolving — about the amount of force that is necessary
> in a particular situation." Graham, 490 U.S. at 396-97, 109 S. Ct.
> 1865.  The reasonableness inquiry is also an objective one. "[T]he

9

question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397, 109 S. Ct. 1865. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id. at 397, 109 S. Ct. 1865; see Scott v. United States, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978). Furthermore, this Court has concluded that "Fourth Amendment jurisprudence has staked no bright line for identifying force as excessive," that "[t]he hazy border between permissible and forbidden force is marked by a multifactored, case-by-case balancing test," and "[t]he test requires weighing of all the circumstances." Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997).

Jackson v. Sauls, 206 F.3d 1156, 1169-70 (11th Cir. 2000); see also Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1168 (11th Cir. 2005), cert. denied, 547 U.S. 1112, 126 S. Ct. 1914, 164 L. Ed. 2d 664 (2006).

Although the court has recited the evidence in a light most favorable to the non-moving plaintiff, the legal "reasonableness" of the force used must be viewed from the perspective of the officer on the scene. Jackson v. Sauls, 206 F.3d 1156, 1169-70 (11th Cir. 2000); Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1168 (11th Cir. 2005). The test is the "objective reasonableness" of the force used by the officer, regardless of his subjective motive or animus, taking into account the often split-second nature of the decisions officers must make about the use of force. The assessment of "reasonableness" entails careful consideration of a number of factors. For example:

The Supreme Court has established that, in order to balance the necessity of using some force attendant to an arrest against the arrestee's constitutional rights, a court must evaluate a number of factors, "including the severity of the crime at issue,

10

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." [Graham], 109 S. Ct. at 1872. See also, e.g., Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir. 1986) (holding that, in determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted). Graham dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.

Lee v. Ferraro, 284 F.3d 1188, 1197-98 (11th Cir. 2002).

A different situation exists where an arrest is made without probable cause or arguable probable cause. Where the arrest is made without even arguable probable cause, any degree of force may be unlawful. Sheth v. Webster, 145 F.3d 1231, 1238 (11th Cir. 1998). However, so long as an officer has probable cause "to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Lee, 284 F.3d at 1194-95, quoting Atwater v. City of Lago Vista, 532 U.S. 318, 121 S. Ct. 1536, 149 L. Ed. 2d 549 (2001). Both the Supreme Court and the Eleventh Circuit Court of Appeals have noted that an officer's right to effect a lawful arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof." Lee, 284 F.3d at 1200, quoting Graham, 490 U.S. at 396.

Two cases provide clear precedent for a conclusion that the conduct of the officers at issue here did not constitute excessive force, and that no constitutional violation occurred despite the tragic death of the young decedent.[9] In applying that law to the facts of this case, the court relies almost

---

[9]    The court takes note of evidence that the decedent, a 23-year-old man with only a very minor criminal history, may have been suffering from schizophrenia, and had a history of delusions. It is entirely possible that the young man's flight from officers was motivated from an irrational fear

exclusively upon its viewing of the video and audio recordings of the short chase and the shooting that followed.[10]

In Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007), the Supreme Court held that the use of deadly force to stop a suspect whose flight might endanger the lives of innocent bystanders did not constitute excessive force.  In Scott, a police officer became involved in a high-speed chase with a car whose driver refused to pull over.  At one point during the chase, the suspect had entered a parking lot and had been "nearly boxed in" by police cars, but the suspect had evaded the trap and raced off onto the street again.   The six-minute chase was put to an end when the police officer rammed the rear of the suspect's car, causing the suspect to lose control and veer off the roadway.   The suspect was severely injured, and filed an action asserting that he had been subjected to excessive force.  550 U.S. 374-75.  In arguing that the conduct of the officer constituted excessive force, the plaintiff in Scott argued that he was driving "in control," and that he slowed for turns, used his turn indicators, and generally posed no threat to other motorists or pedestrians.  The Court, mindful of its duty to view the facts in the light most favorable to the

---

or a delusion.  As unfortunate as the outcome is, the officers on the scene had no way of knowing of the driver's mental state, and were forced to make split-second judgments as to the best course of action.

[10]      Also provided by defendants Baygents and Sanford are affidavits relating to the events, in which the officers describe the decedent's expression as menacing.  Baygents further relates his belief that the decedent had thrown something out of the car, which in his experience is often illegal drugs, and which caused him to be concerned that the driver was drug-impaired. (Ex. D. to Doc. 55).  Sanford similarly testified that the decedent appeared "menacing" and that the decedent drove the SUV directly toward him.  (Ex. E to Doc. 55).  Such affidavits may properly be considered by the court in determining the "reasonableness" of an officer's use of force, but, in this case, the affidavits are simply unnecessary.  It is clear from the video recording of the incident that the decedent posed a threat to the officers and to members of the public he might encounter if the chase continued.

nonmoving plaintiff, nevertheless discounted plaintiff's version of the incident.  Instead, the Court

noted:

> The first step in assessing the constitutionality of Scott's actions is to determine the relevant facts. As this case was decided on summary judgment, there have not yet been factual findings by a judge or jury, and respondent's version of events (unsurprisingly) differs substantially from Scott's version. When things are in such a posture, courts are required to view the facts and draw reasonable inferences "in the light most favorable to the party opposing the [summary judgment] motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (*per curiam*); *Saucier, supra*, at 201, 121 S.Ct. 2151. In qualified immunity cases, this usually means adopting (as the Court of Appeals did here) the plaintiff's version of the facts.

> There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question.  There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened.  The videotape quite clearly contradicts the version of the story told by respondent and adopted by the Court of Appeals.  For example, the Court of Appeals adopted respondent's assertions that, during the chase, "there was little, if any, actual threat to pedestrians or other motorists, as the roads were mostly empty and [respondent] remained in control of his vehicle." 433 F.3d, at 815.  Indeed, reading the lower court's opinion, one gets the impression that respondent, rather than fleeing from police, was attempting to pass his driving test:

> "[T]aking the facts from the non-movant's viewpoint, [respondent] remained in control of his vehicle, slowed for turns and intersections, and typically used his indicators for turns. He did not run any motorists off the road.  Nor was he a threat to pedestrians in the shopping center parking lot, which was free from pedestrian and vehicular traffic as the center was closed.  Significantly, by the time the parties were back on the highway and Scott rammed [respondent], the motorway had been cleared of motorists and pedestrians allegedly because of police blockades of the nearby intersections." *Id.*, at 815-816 (citations omitted).

> The videotape tells quite a different story.  There we see respondent's vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit.  We see it run multiple red lights and travel for considerable periods of time in

the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up. Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury.

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. 376-381.

The plaintiff does not argue that there was no probable cause to arrest the decedent for the traffic infractions committed within view of the officer.  Plaintiff does not even argue that the decedent was not driving recklessly and creating a danger for those in his path, whether other motorists or the police officers.  Essentially, plaintiff argues that, once the suspect began to drive the car towards the officer in an effort to continue his flight, the officers were obligated to simply step out of the way of the fleeing suspect and let him escape. It is interesting to note that in Scott,

there was no allegation that, other than the danger created by the chase, the fleeing suspect posed a threat to the officers, or that the suspect had made any apparently aggressive moves toward the officer.  The perceived danger was that to other motorists, pedestrians or officers who might be in his path as the chase continued.  In the instant case, the decedent not only posed a threat by continuing to flee at high speeds and in disregard of traffic laws, but he posed an immediate and substantial threat to Sanford, who not only was in the path of the decedent's car, but who actually was hit by decedent's car.[11]

But even if it could be said that the decedent's conduct created no direct threat to the officers, it does not follow that the officers were obligated to step aside and allow the decedent to drive off.  The very argument now made by plaintiff was rejected by the Supreme Court in Scott.  In response to the argument that the danger to public could have been averted if the officers simply had ceased chasing the plaintiff, the Court wrote acidly:

> But wait, says respondent: Couldn't the innocent public equally have been protected, and the tragic accident entirely avoided, if the police had simply ceased their pursuit? We think the police need not have taken that chance and hoped for the best.  Whereas Scott's action — ramming respondent off the road — was certain to eliminate the risk that respondent posed to the public, ceasing pursuit was not.  First of all, there would have been no way to convey convincingly to respondent that the chase was off, and that he was free to go.  Had respondent looked in his rear-view mirror and seen the police cars deactivate their flashing lights and turn around, he would have had no idea whether they were truly letting him get away, or simply devising a new strategy for capture.  Perhaps the police knew a shortcut he didn't know, and would reappear down the road to intercept him; or perhaps they were setting up a roadblock in his path. [Citation omitted].  Given such uncertainty, respondent might have been just

---

[11]    The court is at a loss as to how to make sense of plaintiff's counsel's assertion that the decedent did not pose a threat to the officer when, in fact, the decedent's car hit the officer, pinned him against a parked car, and caused him serious injury.

as likely to respond by continuing to drive recklessly as by slowing down and wiping his brow.

Second, we are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive so *recklessly* that they put other people's lives in danger.  It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights.  The Constitution assuredly does not impose this invitation to impunity-earned-by-recklessness.  Instead, we lay down a more sensible rule: A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.

Scott v. Harris, 550 U.S. 372, 385, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); see also Beshers v. Harrison, 495 F.3d 1260 (11th Cir. 2007).  Thus, above and beyond the immediate threat to Officers Baygents and Sanford posed by the decedent's attempt to leave the parking lot and resume his high-speed flight and their right to protect themselves from the threat, the police officers also were entitled to use reasonable force, including deadly force, to stop  risk posed by the decedent's dangerously reckless high-speed driving to innocent motorists.

The only evidence offered by the plaintiff consists of: (1) the depositions of the mother and brother of the decedent, neither of whom witnessed any of the events at issue; (2) a press release issued after the events at issue by the Tuscaloosa Police Department; (3) the death certificate; (4) correspondence between counsel after the filing of the complaint; (5) the report issued by the Alabama Bureau of Investigation regarding the shooting;[12]  (6) photographs of the scene;

---

[12]     The investigation resulted in a finding that the decedent was "accelerating quickly" toward Sanford before the shooting.  The ABI further concluded that Baygents fired his gun "in an attempt to protect the life of Officer Sanford," and that Sanford fired his gun "feeling that his life was in danger."  The report stated that the decedent died from two bullets that entered through the

(7) Tuscaloosa Police Department manuals; (8) decedent's autopsy report; (9) an Alabama statute; and (10) discovery requests and responses. (Exhibits A-P to Doc. 66). Plaintiff's entire argument relating to qualified immunity is premised on counsel's unsubstantiated contention that the decedent "presented no threat to the officer or anyone else, and [was] not resisting or attempting to flee." (Plaintiff's Opposition, Doc. 65, p. 29.) As in Scott, the court refuses to adopt the plaintiff's version of events[13] because they are "blatantly contradicted" by the record. As describe above, the dashcam video from Officer Baygents' car plainly shows a high-speed chase, ending in an apartment parking lot. The video shows the decedent's vehicle pull into a parking space and, then, almost immediately, back out of the space and turn toward the two officers, who yelled a warning and then opened fire. No reasonable jury could find that the decedent's attempt to leave the parking lot by driving toward the officers was not a threat to them.

Plaintiff asserts that the decedent was "not the aggressor" and that his gunshot wounds came from the side, but there is no evidence that supports those assertions. The autopsy clearly states that the entry wounds were "½ inch to the right of the *anterior* midline" and "3/4 inches to the left of the *anterior* midline." (Plaintiff's Ex. H, Doc. 66, p. 2 (emphasis added)). Similarly, the ABI report states that the entrance wounds were to the *front* of the neck. All of the evidence available to this court, including the location of the bullet holes in the decedent's windshield, indicates that the gunshots that killed the decedent were fired from in front of him. Plaintiff further argues that the

---

front of his neck.

[13]      The plaintiff's version in this case is even less worthy of credence in that it is not supported by any evidence, as there were no eyewitnesses to the incident except the officers and the decedent. In Scott, the plaintiff survived and provided testimony as to the events.

officers acted "unreasonably" because the decedent's "only crimes" were "running a red light, running a stop sign, alluding [sic] police, and hit and run with property damage." This assessment, aside from minimizing the decedent's actions, simply misses the point. Plaintiff must concede that the officers had probable cause to arrest the decedent, even if for only minor traffic offenses. But once the officers attempted to make the arrest and the decedent drove his vehicle toward them, the threat he posed to the officers rose dramatically. The situation was no longer (if it ever was) a minor traffic incident — it became a threat to the safety and lives of the officers.

The court further is persuaded that the actions of Baygents and Sanford did not constitute excessive force by the clear mandate of Pace v. Capobianco, 283 F.3d 1275 (11th Cir. 2002). In Pace, a driver was pulled over for driving without his headlights on at night. The driver had no drivers license, and the deputy ordered him to get out of the car. The driver struggled and ran off, but returned to his car and fled. 283 F.3d at 1277. After a 15-minute high-speed chase, the driver turned into a cul-de-sac and stopped. The driver remained in the car with his engine running, while deputies yelled at him to get out of the car. The car stopped for a "very few seconds" and the deputy fired two shots through the front windshield. The car then began to move forward, and the deputy fired five more shots. The driver was killed. 283 F.3d at 1277-78. In opposition to the defendants' motion for summary judgment, the plaintiff in Pace presented an affidavit from an eyewitness to the shooting in the cul-de-sac. That witness stated that he "observed motion in the red car which I believe was [the driver] raising his hands ... in an attempt to surrender," and that he never saw the driver try to run the deputies over, or to be a threat to any officers on the scene. 283 F.3d at 1279.

The Eleventh Circuit Court of Appeals stated:

... Davis, once he began the chase, never left his automobile or even turned the engine off. By the time of the shooting, Davis had used the automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon with which Davis was armed. *See Durrance v. State*, 250 Ga. App. 185, 549 S.E.2d 406, 407-08 (2001); *Blalock v. State*, 165 Ga. App. 269, 299 S.E.2d 753, 753-54 (1983).

Given the facts in the light most favorable to Plaintiff, reasonable police officers could have believed that the chase was not over when the police fired on Davis. Even when we accept the Hedge affidavit as true that Davis's car, in the cul-de-sac, did not try to run over the deputies and that Davis, in the cul-de-sac, did not aim the car at the deputies, Davis's car was stopped for, at most, a very few seconds when shots were fired: no cooling time had passed for the officers in hot pursuit. Davis, while fleeing, had left the streets and driven through a residential yard before; so, that he had pushed the nose of his car to within 3 or 4 feet of a curb in the front of a home (as Hedge says) could mean little to the officers about whether the chase was finally over. And the police — before shooting — did yell to Davis to "get out of the car," which he never did.

Given the facts and circumstances of this case, we cannot conclude that the Fourth Amendment ruled out the use of deadly force.

Pace, 283 F.3d at 1282-83.

Pace presents facts strikingly similar to the facts of this case, except in this case the plaintiff has no evidence at all to support his allegations that the decedent did not pose a threat to the officers. The court in Pace determined that the Fourth Amendment did not proscribe the use of deadly force where a traffic offender refused to end a chase in which he drove dangerously. That court further determined that, in the alternative, the individual defendants were immune from suit based upon qualified immunity. 283 F.3d at 1282. In this case, it is also clear that the use of deadly force in the face of decedent's SUV *actually moving toward the officers*, was not objectively unreasonable or in violation of the Fourth Amendment proscription against excessive force.

19

Other case law compels the same result.  In <u>Long v. Slaton</u>, the Eleventh Circuit Court of Appeals applied qualified immunity in a case in which officers shot at a suspect who was backing *away* from the officers in the patrol car the suspect had commandeered.  508 F.3d 576, 578-79 (11th Cir. 2007)(holding that a motor vehicle is potentially a dangerous instrument under Alabama law, and the officers did not have to wait until the suspect used the car in an aggressive manner before shooting).  While it is true that officers are not constitutionally permitted to use deadly force to end every high-speed chase or to stop every fleeing suspect, it is well established that such force may be used where the suspect "poses a grave danger" to the officers or to others.  <u>See</u>, *e.g.*, <u>Brosseau v. Haugen</u>, 543 U.S. 194, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004), and cases cited therein; <u>Scott v. Clay County</u>, 205 F.3d 867, 878 (6th Cir. 2000); <u>Smith v. Freland</u>, 954 F.2d 343 (6th Cir. 1992).  The same principles apply in the instant matter.  In this case, the decedent aimed the car in the direction of the police officer and accelerated toward him; he was given a warning to stop or get shot.  It has been noted that "[no one would (or should) second-guess an officer who fired at the moment he reasonably believed that his life was on the line."[14]  <u>Hernandez v. City of Miami</u>, 302 F. Supp. 2d 1373, 1378-79 (S.D. Fla. 2004), citing <u>Graham v. Connor</u>, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).  Even if the driver of the car that was aimed toward the officer was "merely trying to reposition his car for escape," it has been deemed objectively reasonable for an officer to believe he was in grave danger.  <u>Puglisde v. Cobb County</u>, 4 F. Supp. 2d 1172, 1180 (N.D. Ga.

---

[14]     The fact that shots were fired by both Baygents and Sanford, and that the question of which officer's bullets killed the decedent remains unanswered is of no moment.  Sanford's fear for his own life was objectively reasonable; and Baygents was entitled to act in defense of Sanford.

1998).  Accordingly, the facts of this case do not support a finding that a constitutional violation occurred.

### B.  Qualified Immunity

Under federal law, it is well settled that qualified immunity protects government officials performing discretionary functions from civil suit, and from liability, where their conduct does not violate "clearly established statutory or constitutional rights."  Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).  The shield of qualified immunity has been expanded to include acts that may not involve the exercise of "actual discretion," and can include acts that may be ministerial but are "job-related functions" and are through means that are within the official's authority to utilize.  Holloman v. Harland, 370 F.3d 1252, 1265-66, (11th Cir. 2004), quoting Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1185 n. 17 (11th Cir. 1994).

The Supreme Court recently re-articulated the standard for a qualified immunity analysis, stating that "qualified immunity balances two important interests, the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, ___ U.S. ___, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).  Under Pearson, the court must grant qualified immunity unless the plaintiff can demonstrate: first, that the facts viewed in the light most favorable to the plaintiff establish a constitutional violation by the officers, and second, that it was clearly established at the time of the incident that the actions of the defendant were unconstitutional. 129

S. Ct. at 814-15, 817-18.[15]  Furthermore, it is the general rule that qualified immunity will protect government actors from liability, and only in "exceptional cases" will the immunity be unavailable as a shield.  Harris v. Board of Educ. of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997).  Even so, qualified immunity does not apply in those instances where the case law establishes a "bright line" in such a "concrete and factually defined context" to make it obvious to all reasonable government actors, in the defendant's place, that the actions violate federal law.  Scarbrough v. Myles, 245 F.3d 1299, 1301 (11th Cir. 2001).

The initial burden of demonstrating that the public official is acting within the scope of his position lies with the defendant asserting that defense.  Holloman, 370 F.3d at 1264.  The test is not whether the defendants had the authority to effectuate an illegal act, but whether their jobs entailed engaging in the act in general.  See 370 F.3d at 1266.  In other words, the court does not ask whether defendants had the right to use excessive force against the plaintiff, but simply whether making arrests was within the general scope of the officers' duties.  The answer, of course, is in the affirmative.

Once the defendant has met that burden, as defendants in this case have, the burden shifts to the plaintiff to show that the defendants are not entitled to qualified immunity.  370 F.3d at 1264.  To prevail against an assertion of qualified immunity, the plaintiff must demonstrate that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the

---

[15]      Pearson further holds that the court is no longer required to perform a qualified immunity analysis in the order stated in Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), and instead is "permitted to exercise sound discretion" in whether the first or second prong is looked at first. Pearson, 129 S. Ct. at 818.

alleged violation."  370 F.3d at 1264, citing <u>Wilson v. Layne</u>, 526 U.S. 603, 609, 199 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999).

In this case, plaintiff has failed to come forward with any evidence that would show that the individual defendants are not entitled to qualified immunity.  The existing law at the time of the incident did not put the officers on notice that shooting the decedent was "clearly unlawful given the circumstances."  <u>Pace</u>, 283 F.3d at 1282.  Thus, even if the shooting amounted to a violation of the Fourth Amendment (which the court finds that it did not), the law was not so clearly established in concrete terms to put Officers Baygents and Sanford on notice that shooting the decedent under these circumstances was a violation of the Fourth Amendment.  Indeed, if anything, the facts, rationale, and holding in <u>Pace</u> would tell a reasonable officer that shooting a suspect in a fleeing vehicle whose conduct poses a threat to the safety of the officers is not a violation of the law.  Accordingly, the motion for summary judgment filed by the individual defendants is due to be granted for this additional reason.

### C.  Liability of the Municipality

It is well-settled that a municipality cannot be liable for a constitutional tort under § 1983 unless the deprivation of the constitutional right occurred as a result of an official policy or custom of the governmental body.  <u>See</u> <u>Monell v. Department of Social Services of New York</u>, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978).  Moreover, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  <u>Id</u>. at 691.  The Eleventh Circuit Court of Appeals has further determined that a municipality may be liable under § 1983 for the actions of

a police officer only when the city's "official policy" caused the violation.  Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).

In order to survive summary judgment on the § 1983 claims, the plaintiffs must have come forward with evidence to show that the city had a policy of unlawfully or illegally arresting suspects or of applying excessive force.[16]  Again, plaintiff has failed to offer any evidence to support such a claim.  Moreover, plaintiff has not offered any argument that there exists any such policy or custom.  For this reason, the defendant City's motion for summary judgment on the § 1983 claims of excessive force against the city are due to be granted.

## IV.  CONCLUSION

Based on the foregoing undisputed facts and legal conclusions, the court finds that the motions for summary judgment (Docs. 55, 58) filed by the defendants are due to be granted, and all of plaintiff's claims are due to be dismissed with prejudice.  A separate order will be entered in accordance with the findings set forth herein.

DATED this 30th  day of March, 2010.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

----

[16]        Plaintiff's counsel argues that the City engaged in a "cover-up" after the shooting. His support for that argument is the media release discussed *infra*, and the fact that counsel for the City sought sanctions against plaintiff and asserted that the instant case was "frivolous."  Such allegations wholly fail to support a conclusion that the City had a policy or custom of using excessive force.